UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BLUE ROOSTER LLC, | ) | |
| | ) | |
| Blue Rooster, | ) | |
| | ) | |
| vs. | ) | Case No.  4:17-CV-02689-AGF |
| | ) | |
| PERFICIENT, INC., | ) | |
| | ) | |
| Perficient. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Blue Rooster LLC's motion (ECF No.

35) for partial summary judgment on Count I, and Defendant Perficient, Inc.'s cross

motion (ECF No. 55) for summary judgment on all Counts of Blue Rooster's complaint.

The Court heard oral argument on both motions on April 4, 2019.  For the reasons set

forth below, the Court will grant Perficient's motion and deny Blue Rooster's motion.

## BACKGROUND

This breach of contract action arises out of Perficient's purchase of Blue Rooster's

proprietary software known as Rise Foundation ("Rise").  Perficient agreed to pay Blue

Rooster a royalty on certain revenue it earned from Rise, after the deduction of certain

costs, for a three-year period.  The parties' dispute centers on how that royalty payment

was to be calculated.  For the purpose of the motions before the Court, the record

establishes the following.

Rise is a "package of products and services," that "[w]hen deployed on a

company's system, . . . quickly builds an inward-facing website that sits on top of [Microsoft] SharePoint and Office 365, making those products customized and user-friendly."  Compl., ECF No. 1 ¶ 15.  According to the complaint, Rise is "effectively, 'intranet-in-a-box,' and because it is software sold on a subscription basis, it is considered 'software as a service' or 'SaaS.'"  *Id.* ¶ 17.

"Rise intranet is standardized, but companies . . . can easily customize it with branding, add-on products, and specialized applications."  *Id.* at ¶ 18.  When Blue Rooster owned Rise, in addition to the subscription fees charged for access to Rise, Blue Rooster offered consulting services to help customers customize Rise, and Blue Rooster charged separate fees for these services.  *Id.*

**Asset Purchase Agreement ("APA")**

Perficient purchased Rise pursuant to the APA, signed on October 12, 2015.  ECF No. 1-1.  The opening paragraphs of the APA defined Perficient as the "Buyer" and Blue Rooster as the "Seller," and stated, in relevant part:

> Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, certain of Seller's assets and properties used or held for use in connection with Seller's Rise Foundation software-as-a-service (the "***Product***"), and in connection therewith, Buyer has agreed to assume certain of the liabilities of Seller relating to the Product, all on the terms and conditions set forth herein (the "***Acquisition***").[1]

APA at 1 (emphasis in original).

Section 2.05 set forth the "Purchase Price and Related Matters" for Perficient's

---

[1]     This is the only place in the APA where the term "Product" is defined.

purchase of Rise.   This section stated:

> **2.05 Purchase Price and Related Matters.** In consideration of the sale and transfer of all of Seller's rights, title and interests in the Acquired Assets, Buyer shall:
>
> (a) assume the Assumed Liabilities;[2]
>
> (b) once the Closing Date Deferred Revenue Amount[3] has been recouped by Buyer in full, during the Payment Period[4] and subject to the aggregate cap stated below, pay to Seller on the 15th day of each month the Monthly Payment Amount, if any, as calculated in accordance with <u>Schedule I</u> attached hereto and incorporated herein, which aggregate amount of monthly payments shall in no event exceed Five Million Dollars ($5,000,000); and
>
> (c) pay to Seller on the 15th day of each month, the amount of all unpaid PreClosing Accounts Receivable,
>
> collectively, items (a) and (b) above shall be deemed the "***Purchase Price***".

APA § 2.05 (emphasis in original).

> Schedule I, in turn, stated, in relevant part:
>
> The Payment Period and all payments under this Schedule I shall terminate on October 12, 2018, or earlier upon the payment of an aggregate amount of $5,000,000. For the avoidance of doubt, in no event shall the aggregate Monthly Payment Amounts exceed $5,000,000.

---

[2]    Section 2.03 of the APA discusses the liabilities that Perficient assumed, but the parties do not address this section or describe the assumed liabilities in any detail in their summary judgment briefs.

[3]    The "Closing Date Deferred Revenue Amount" was defined as "the amount, as of the Closing Date, of deferred revenue collected by Seller on Assigned Contracts which were unperformed by Seller on the Closing Date." APA § 1.01.  According to the Complaint, the  Closing Date was December 31, 2015.  Compl. ¶ 42.

[4]    The "Payment Period" was defined as "the three year period beginning on the Closing Date and ending on October 12, 2018."  APA § 1.01.

<u>Monthly Payment Amounts</u>

During the Payment Period, the Monthly Payment Amount, if any, shall be (a) an amount equal to the product of (i) 30% and (ii) the Rolling License Fee Excess less (b) the aggregate amount already paid to Seller during the Payment Period.

Rolling License Fee Excess means an amount equal to (a) the cumulative Product license fees received by Buyer through the current monthly reporting period since the Closing Date less (b) the Cumulative Break-Even Amount.

The Cumulative Break-Even Amount shall be an amount equal to the Closing Date Deferred Revenue Amount plus the product of (a) $54,000 and (b) the number of months (which number shall be an integer) concluded within the Payment Period

APA Schedule I.

The term "Product license fees" is not defined in Schedule I or anywhere else in the APA. It is undisputed that the Cumulative Break-Even Amount, and, specifically, the $54,000 cumulating on a monthly basis, was intended to compensate Perficient for the salaries it would pay to three Blue Rooster employees who supported Rise (the "Rise employees") and who would be transferring to Perficient.

Schedule I included a few sample payment calculations, using hypothetical numbers, and then concluded with the following paragraphs:

<u>Further Agreements:</u>

Seller currently sells the Product on a subscription basis – this subscription is monthly in nature and for a period of 3 years renewable annually. Clients are inclined to pay for all SaaS services up front for the entire year and some have requested to pay for the three year period on an upfront basis.

Amounts due hereunder shall be calculated using the entire revenue

received by Buyer; provided, however, if Buyer returns any portion of the up front fees to the client for any reason, Seller shall reimburse Buyer for its allocable share of the returned fees upon demand by Buyer and Buyer shall be entitled to withhold payment of and offset against payment of the Monthly Payment Amount any amount due hereunder from Seller to Buyer as a result of any such returned fees. The right of offset is cumulative to any other rights or remedies Buyer may have.

*Id.*[5]

**Monthly Payments**

Perficient has not made any Monthly Payments to Blue Rooster. At all times since the execution of the APA, the amount of the monthly subscription fees that Perficient collected for Rise has not exceeded the Cumulative Break-Even Amount. Thus, if the term "Product license fees" as used in Schedule I included only the monthly subscription fees for Rise, no Monthly Payment would have been due under Section 2.05.

Perficient earned additional revenue for what it termed "professional services," which are consulting services that Perficient offered to customers to customize and/or supplement the otherwise standardized Rise functionality. Examples of such services included "migrat[ing] [customers'] existing on-premises intranet (an intranet that is hosted on a customer's servers), to a cloud-based intranet service like Microsoft SharePoint," and "build[ing] customized intranet portal components that layer on top of or alongside the default Rise webparts." ECF No. 41 at 4. According to Perficient, some of its larger customers request these additional services, which cannot be accomplished

---

[5]     Section 2.06(c) provided that "[e]ach party hereto agrees that it shall, with respect to all matters related to the Monthly Payment Amount, act in good faith and the spirit of fair dealing." APA § 2.06(c).

simply through the use of Rise. Perficient charged an hourly fee for the staff time spent on such services, and billed customers for these professional services fees separately from the monthly subscription fee for Rise. Such professional services were central to Perficient's business even before Perficient purchased Rise from Blue Rooster.

If Perficient included as part of the "Product license fees" the revenue earned from professional services it provided to Rise customers, then Perficient would have owed Blue Rooster Monthly Payments totaling at least $510,000 to date.[6]

**Payment Statements**

The APA also required Perficient to deliver to Blue Rooster, on the 15th day of each month, a "calculation and statement of the Monthly Payment Amount (the '***Payment Statement***')," as well as any necessary supporting documentation and access to its books and records. APA § 2.06(a) (emphasis in original). Perficient admits that it did not timely send Payment Statements for certain months in 2016 and early 2017. However, it is undisputed that Perficient has now provided all Payment Statements and documents that Blue Rooster alleges were required to be produced under Section 2.06(a).

**Transfer of Employees**

As indicated above, the APA provided that Perficient would hire Blue Rooster's three Rise employees. *See* APA § 5.02. Separate and apart from the APA, the parties

---

[6]     Blue Rooster asserts that its motion for partial summary judgment on Count I seeks a ruling only on "contract interpretation and findings of breach," and that it will seek damages at a later stage. ECF No. 37 at 10 n.3.

also discussed whether Perficient would hire five Blue Rooster employees who did not work on Rise (the "non-Rise employees"). Four of the five non-Rise employees were hired by Perficient in September of 2015.[7] The parties dispute the terms of their discussions with respect to Perficient's hiring of these non-Rise employees.

According to Perficient, on August 31, 2015, Blue Rooster requested that Perficient hire the non-Rise employees because Blue Rooster was at that time suffering serious financial difficulties and could not make payroll.[8] Perficient points to emails between Blue Rooster and Perficient reflecting these discussions. The emails reflect that, on September 2, 2015, Perficient offered to hire the non-Rise employees beginning in October 2015, and that Blue Rooster would have to continue paying the employees through September 2015. *See* ECF Nos. 57-1 at 3-4, 166-173. The emails do not mention any offer of compensation by Perficient.

Blue Rooster admits to the content of the above email discussions. But Blue Rooster argues that, in addition to the emails, the parties spoke by telephone in "early September 2015," when Perficient "promised to compensate Blue Rooster for facilitating the transfer of [the non-Rise] employees." *See, e.g.*, ECF No. 61 at 12. Blue Rooster contends that the parties spoke by telephone again in "early October 2015," when

---

[7]     These were Justin Shands, Anthony Hoelscher, John Pearman, and Steven Franck. The fifth employee, Joshua Campbell, never worked for Perficient and instead took a job with a different company.

[8]     After execution of the APA, Blue Rooster fired all employees (except its founder) who were not hired by Perficient.

Perficient "confirmed [its] promise to address the issue of compensation," not in the APA but "at a later date." *Id.* at 29. In support of these contentions, Blue Rooster cites the deposition testimony, interrogatory responses, and affidavit of its founder, Kevin Conroy, who attested to these facts.

It is undisputed that Perficient never stated how much or when it would pay Blue Rooster as compensation for facilitating the transition of the non-Rise employees; that Blue Rooster never received a written offer of compensation from Perficient for the transition of these employees; that Blue Rooster never received an alternative offer of compensation from any other company for the placement of these employees; and that to date, Perficient has not paid Blue Rooster any money as compensation for facilitating the transfer of Blue Rooster's employees. *Id.* at 14-16.

## Complaint

Blue Rooster filed suit in this Court[9] on November 7, 2017. In Count I, Blue Rooster asserts that Perficient breached the APA and the implied covenant of good faith and fair dealing by (1) failing to timely deliver all monthly Payment Statements and provide access to records necessary for Blue Rooster to verify the Monthly Payment Amounts; and (2) excluding the revenue characterized as "professional services" from the calculation of the Product license fees for the Monthly Payment Amount.[10] In Count II,

---

[9]     Blue Rooster invoked the Court's diversity jurisdiction.

[10]     Blue Rooster further alleged in Count I that Perficient breached the covenant of good faith and fair dealing by "structuring deals with customers to minimize the

Blue Rooster alleges that Perficient was unjustly enriched by the October 2015 transfer of the non-Rise employees to Perficient. Blue Rooster alleges that Perficient made promises, separate and apart from the APA, to compensate Blue Rooster for facilitating the transfer of these employees and that Perficient has refused to provide such compensation.[11]

## ARGUMENTS OF THE PARTIES

As noted above, Blue Rooster has moved for partial summary judgment on Count I, and Perficient has filed a cross motion for summary judgment on all Counts.

### Count I (Breach of Contract)

#### *Exclusion of Professional Services Fees from Product License Fees*

Blue Rooster argues that Perficient breached the APA by failing to include the professional services fees as part of the "Product license fees" in the Monthly Payment

---

monetary value of the Rise subscription." Compl. ¶ 56. Perficient interpreted this claim as challenging the discounts on Rise subscription fees that Perficient offered to certain customers. Perficient argued that summary judgment was warranted on any such claim because the APA gave Perficient complete discretion in how it priced Rise, including whether it could offer customers discounts. *See* ECF No. 57 at 6, 9-10. However, in response to Perficient's argument, Blue Rooster stated that it never intended to assert any claim based on improper discounts; rather, the language quoted above merely reiterates Blue Rooster's argument that Perficient breached the covenant of good faith and fair dealing by failing to include its fees for "professional services" in the calculation of the Product license fees for the Monthly Payment Amount. ECF No. 60 at 2, 7-8. Therefore, the Court will not address Perficient's arguments based on its customer discounts.

[11] Blue Rooster also asserted a claim for promissory estoppel based on these facts (Count III). However, Blue Rooster did not respond to Perficient's motion for summary judgment on the promissory estoppel claim, and at oral argument, Blue Rooster conceded that had abandoned this claim. Therefore, the Court will grant Perficient's motion for summary judgment on Count III.

Amount calculation.  Blue Rooster argues that the term "Product license fees" is unambiguous and includes the professional services fees.

In support of its argument, Blue Rooster points to the language under the "Further Agreements" section of Schedule I, stating that "[a]mounts due hereunder shall be calculated using the *entire revenue* received by Buyer . . . ."  APA, Schedule I (emphasis added).  Blue Rooster contends that this language, in the context of the APA as a whole, reflects the parties' intent to include all revenue that Perficient earned from Rise, including the professional services fees, when calculating the Monthly Payment Amount.

In response to Blue Rooster's motion and in support of its own motion, Perficient agrees that the term "Product license fees" is unambiguous, but Perficient argues that the term includes only those fees "paid by a customer for a monthly subscription to *the product*," which Perficient argues is defined to mean "Rise."  ECF No. 41 at 10 (emphasis in original).  Perficient argues that the term "Product license fees" does not include the professional fees received from Perficient's provision of consulting services.

Perficient also contends that Blue Rooster's reliance on the "entire revenue" language of the "Further Agreements" section of Schedule I is without merit.  Perficient notes that the "Further Agreements" section explicitly references the pre-payment of monthly subscription fees for Rise that some clients desire to pay up front for the entire year or for a three-year period.  When read in this context, Perficient argues, the "entire revenue" language merely reflects the parties' agreement that if Perficient "received prepayment for a year or three years' worth of Rise license fees, it would immediately

credit Blue Rooster for the entire amount" rather than prorate the credit over the course of a year. *Id.* at 12.

Further, Perficient cites the report of its designated expert to argue that the term "license fees" has a clear definition within the SaaS industry, and refers to the fees received from a customer for access to the SaaS product and for technical support and product maintenance, but excludes any revenue from professional services.

Finally, Perficient argues that, if the Court were to deem the term "Product license fees," ambiguous, the Court should consider Blue Rooster's pre- and post-execution conduct, which, according to Perficient, demonstrates that Blue Rooster never interpreted the APA to require royalties on revenue from professional services. In support of this argument, Perficient relies on several documents attached to its summary judgment briefs. These include a revenue projections spreadsheet for Rise that Blue Rooster prepared on or about August 31, 2015, which, according to Perficient, excludes revenue from "service engagements." ECF No. 41-1 at 206. Perficient has also attached emails that Conroy sent to Perficient representatives both before and after the APA was executed, in which, according to Perficient, Conroy attempted to leverage the fact that the APA did not entitle Blue Rooster to a royalty on professional services fees in order to negotiate for other benefits (such as a reduced Break-Even Amount or additional monetary compensation to Conroy individually). *Id.* at 209-217.

In reply, and in response to Perficient's motion for summary judgment, Blue Rooster reiterates that the term "Product license fees," when read in context of the entire

APA, unambiguously includes "not just revenue from licensing software, but also services attendant to <u>and resulting</u> from installation of that software." ECF No. 47 at 2-3 (emphasis in original). Blue Rooster argues that, because the term is unambiguous, the Court should not consider Perficient's alternative arguments based on its expert's opinions regarding the SaaS industry or on the other extrinsic evidence submitted by Perficient. Blue Rooster also maintains that the "entire revenue" language in the "Further Agreements" section supports its position because that section refers to payments for "all SaaS services." Blue Rooster contends that "all SaaS services" is not limited to "only pre-paid license fee revenue" but also includes professional services. *Id.* at 5.

Further, Blue Rooster argues that the inclusion of the Cumulative Break-Even Amount set forth in Schedule I supports its position. Specifically, Blue Rooster argues that it would not have agreed to compensate Perficient for the cost of employing the Rise employees without being entitled to a portion of the revenue earned by those employees.

In a sur-reply filed with leave of the Court, Perficient argues that, under Delaware law, its expert report regarding the meaning of "license fee" in the SaaS industry is admissible even if the Court deems the APA unambiguous. Perficient further maintains that the reference to "all SaaS services" in the "Further Agreements" section of Schedule I, when read in the context of the APA as well as in the SaaS industry in general, refers to the SaaS product, Rise, which is available for a monthly subscription fee, and does not include the professional services charged separately and on an hourly basis. Finally, Perficient disputes that the inclusion of the Cumulative Break-Even Amount supports

Blue Rooster's position.  Perficient argues that there is no evidence that the Rise employees performed any of the professional services at issue.  Rather, Perficient argues that it provided those professional services even before the parties entered into the APA.

<u>*Monthly Payment Statements*</u>

Blue Rooster further argues that Perficient breached the APA by failing to provide complete monthly Payment Statements, in violation of Section 2.06(a) of the APA.  Blue Rooster argues that "[a]t no time prior to being compelled to do so in this lawsuit did Perficient provide information regarding total Rise revenue . . . ."  ECF No. 37 at 4.

In response, Perficient concedes that there were several months in which, as a result of oversight, it did not timely deliver a monthly Payment Statement.  However, Perficient contends that the Payment Statements are cumulative, each one allowing Blue Rooster to calculate the Monthly Payment Amount due in any previous month.  Perficient argues that Blue Rooster has failed to present any evidence demonstrating that it suffered damages from any untimely delivery of Payment Statements.

In reply, Blue Rooster argues that Perficient's delay in providing certain monthly Payment Statements was damaging because it delayed the time in which Blue Rooster could file suit, depriving it of "money in hand," and "also caused Blue Rooster to incur fees and costs to even uncover Perficient's separate breach."  ECF No. 47 at 9.  However, at oral argument, Blue Rooster admitted that it could not identify any "specific dollar amount" as damages that it suffered as a result of any delay in the production of Payments Statements and related documentation.

## Count II (Unjust Enrichment)

In support of its motion for summary judgment on Count II, Perficient argues that Blue Rooster's unjust enrichment claim fails as a matter of law. Specifically, Perficient argues that Blue Rooster has failed to demonstrate that it played a compensable role in conferring a benefit to Perficient from the transition of the non-Rise employees, or that it would be unjust for Perficient to retain any such benefit.

In response, Blue Rooster argues that it conferred a benefit on Perficient by "assisting" Perficient in acquiring and hiring the non-Rise employees at issue. Blue Rooster contends that its assistance in this regard was "akin to a headhunter" and "saved Perficient the costs of finding and hiring such employees." ECF No. 60 at 11. Blue Rooster further contends that it provided this benefit based in part on an understanding that it would be compensated at a later date, and that it would be unjust for Perficient to retain this benefit without fulfilling its promise of compensation.

## Perficient's Alternative Argument

Alternatively, Perficient contends that each of Blue Rooster's claims is independently subject to summary judgment because Blue Rooster failed to disclose any expert witness to measure its damages. Perficient argues that Blue Rooster needs an expert witness to testify regarding the artificial depression of the Rise license fees (Count I), as well as the industry standard for obtaining a finder's fee with respect to the recruitment and hiring of employees, the value of any such finder fee, and the value of the non-Rise employees (Count II). Without such expert testimony, Perficient argues that

Blue Rooster cannot prove its claims.

Blue Rooster has not responded to this alternative argument.

## DISCUSSION

### Summary Judgment Standard

Federal Rules of Civil Procedure Rule 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences that may be reasonably drawn [therefrom] in the light most favorable to the non-moving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). "The nonmoving may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation . . . ." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (citations omitted).

### Count I (Breach of Contract)

The parties agree that Delaware law governs Count I, pursuant to a choice-of-law provision in the APA. *See* APA § 8.05. Under Delaware law, the elements of a breach of contract claim are (1) the existence of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Although Delaware courts

"cautiously" invoke the implied covenant of good faith and fair dealing to "fill gaps in the express provisions of a specific agreement," the "implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, No. CV 2018-0927-SG, 2019 WL 1223026, at *22 (Del. Ch. Mar. 14, 2019) (citation omitted).

<u>Exclusion of Professional Services Fees</u>

"The proper construction of any contract is purely a question of law." *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017). The inquiry focuses "on the parties' shared expectations at the time they contracted[,] but because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party." *Id.* "The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage." *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, No. 185, 2018, 2019 WL 1068183, at *8 (Del. Mar. 7, 2019).

"When the contract is clear and unambiguous, [courts must] give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence." *Id.* If, on the other hand, the contract is "reasonably susceptible to two or more interpretations or may have two or more different meanings, then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent." *Id.*

In this case, the Court agrees with Perficient that the term "Product license fee" is unambiguous and means the monthly subscription fees that customers paid to access or use Rise. The professional services fees do not fall within this definition. As such, Perficient is entitled to summary judgment on the portion of Count I relating to the exclusion of professional services fees from the calculation of the Product license fees.

A product license fee is a fee paid to license a product. A "license" is generally defined as "permission . . . to commit some act that would otherwise be unlawful," License, Black's Law Dictionary (10th ed. 2014)—in this case, permission to access or use the "Product." The "Product," in turn, is defined in the opening paragraphs of the APA to mean Rise, or most broadly, Blue Rooster's assets and properties used or held for use in connection with Rise. APA at 1. But the professional services at issue were never owned by Blue Rooster. Blue Rooster does not contend otherwise. Those services were simply not the "Product" that Blue Rooster sold to Perficient.

Indeed, at oral argument and in its briefs, Blue Rooster consistently used the term "license" to refer to the privilege of using or accessing the Rise software. A "license fee," then, is the fee paid for such privilege. By contrast, Blue Rooster used the term "Rise-related revenue" to describe the category of revenue in which the professional services fees fall. But as Perficient correctly notes, "Rise-related revenue" appears nowhere in the APA.

Blue Rooster's reliance on the "entire revenue" language in the "Further Agreements" section is misplaced. That section, when read as a whole, refers to the

revenue earned from "sell[ing] the Product on a subscription basis." APA Schedule I. Again, the professional services are not the "Product" that Blue Rooster sold to Perficient; nor were the professional services sold on a subscription basis.

Blue Rooster's argument that Perficient's interpretation of the contract would defeat the intent of the APA, or otherwise violate the implied covenant of good faith and fair dealing, is also without merit. The APA and Schedule I thereto expressly contemplated that the Monthly Payment Amount could be zero. *See* APA § 2.05 (referring to "the Monthly Payment Amount, *if any*") (emphasis added); Schedule I (same). This understanding makes sense in the context of the transaction as a whole, in light of Blue Rooster's financial struggles and Perficient's agreement to assume certain liabilities, as well as the cost of marketing and supporting Rise.

Finally, the Court rejects Blue Rooster's argument based on the Cumulative Break-Even Amount. That argument presupposes that the Rise employees performed the professional services at issue. But as Perficient notes, there is no evidence that this was the case. Rather, Blue Rooster admits that Perficient provided such services as part of its business model before Perficient ever acquired the Rise employees.

*Monthly Payment Statements*

 "Under Delaware law, a breach of contract claim requires a showing of compensable injury." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV 7471-VCP, 2013 WL 5621678, at *19 (Del. Ch. Sept. 30, 2013). "A plaintiff must prove its damages with a reasonable degree of precision and cannot recover damages that are

'merely speculative or conjectural." *Id.* Because Blue Rooster admittedly cannot prove

any non-speculative damages with respect to Perficient's delay in production of Payment

Statements, its breach of contract claim based on such delay fails as a matter of law. *See*

*Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL

3885947, at *12 (Del. Super. Ct. June 23, 2015) ("When the factual record reveals that

plaintiff has suffered no damages as a result of an alleged breach of contract, summary

judgment is appropriate."); *see also In re Cendant Corp. Sec. Litig.,* 181 F. App'x 206,

210 (3d Cir. 2006).

## Count II (Unjust Enrichment)

"Unjust enrichment requires a showing that: (1) the plaintiff conferred a benefit on

the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted

and retained the benefit under inequitable and/or unjust circumstances." *Hargis v. JLB*

*Corp.*, 357 S.W.3d 574, 586 (Mo. 2011) (citations omitted).[12] "The third element . . . is

considered the most significant and the most difficult of the elements." *Sparks v. PNC*

*Bank*, 400 S.W.3d 454, 460 (Mo. Ct. App. 2013). Unjust enrichment is a "quasi-

contractual action" that "permits restitution based upon the value of the benefit received

by the defendant." *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. Ct. App.

2010) (citation omitted). "Thus, a plaintiff must present evidence of the amount of the

---

[12]     The parties agree that either Missouri or Washington law governs Blue Rooster's
unjust enrichment claim, and the parties have not suggested that any conflict exists
between the two.

benefit conferred upon the defendant." *Id.*

Here, Blue Rooster has not presented any evidence as to the value of the alleged benefit conferred, namely, Blue Rooster's "facilitation" of the transfer of the non-Rise employees to Perficient. There is no evidence as to what, exactly, Blue Rooster did to "facilitate" the transfer, the amount by which it enriched Perficient, or why Perficient's retention of the employees—to whom Perficient pays a salary—is unjust.[13] *See, e.g.,* *Hoffmeister v. Kranawetter*, 407 S.W.3d 59, 62 (Mo. Ct. App. 2013) (affirming the trial court's decision that benefits that were not identifiable did not constitute unjust enrichment). Perficient is thus entitled to summary judgment on Count II.

## CONCLUSION

For the reasons stated above, the Court will grant Perficient's motion for summary judgment. The Court need not reach Perficient's alternative argument, based on Blue Rooster's failure to disclose an expert witness.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Perficient, Inc.'s motion for summary judgment is **GRANTED**. ECF No. 55.

---

[13] The parties do not address the effect, if any, of the APA and its integration clause (APA § 8.04) on the unjust enrichment claim. Perficient only discussed the integration clause with respect to the now-abandoned promissory estoppel claim. However, the Court notes that the APA explicitly addressed the transfer of at least some Blue Rooster employees (the Rise employees), and the APA did not provide for compensation to Blue Rooster for such transfer. Rather, the APA provided that Blue Rooster compensate Perficient (via the Break-Even Amount) for the cost of having to hire and employ these employees. These facts support Perficient's argument that Blue Rooster did not play any specific compensable role in Perficient's hiring of Blue Rooster's employees.

**IT IS FURTHER ORDERED** that Plaintiff Blue Rooster LLC's motion for partial summary judgment on Count I is **DENIED**. ECF No. 35.

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of May, 2019.